Lorraine Morey / #029443
MOREY LAW, PLLC
11811 N. Tatum Blvd., Suite 1050
Phoenix, AZ 85028
(602) 603-2450 Telephone
(602) 603-2457 Fax
Lorraine@morey-law.com
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jesus J. Rivera, Jr., on his own behalf and on behalf of his minor child, J.C,; Veronica M. Rivera on her own behalf and on behalf of her minor child, <br><br> Plaintiffs <br><br> v. <br><br> Costco Wholesale Corporation, a Washington corporation; and Boyd Specialty Sleep, a Missouri company, <br><br> Defendants. | Case No: <br><br> COMPLAINT |

Plaintiffs Jesus J. Rivera, Jr., on his own behalf and on behalf of his minor child, J.C, Veronica M. Rivera on her own behalf and on behalf of her minor child J.C., by and through counsel, and for their complaint ("Complaint") against Defendants Costco Wholesale Corporation and Boyd Specialty Sleep, allege as follows:

**PARTIES**

1.      Plaintiffs Jesus J. Rivera, Jr., Veronica M. Rivera, individually, and on behalf of their minor son J.C. (collectively, "Plaintiffs" or the "Riveras"), are all residents and citizens residing in Buckeye, Arizona, Maricopa County, Arizona.

2.     Costco Wholesale ("Costco") is a corporation with its principal place of business in Issaquah, Washington, and transacts business in Arizona.

3.     Boyd Specialty Sleep ("Boyd") is a company with its principal place of business in Maryland Heights, Missouri.  Boyd is in the business of designing, testing, manufacturing, selling, and supporting mattresses subject to this Complaint.

4.     Costco and Boyd collectively, are referred to as "Defendants."

5.     This Court has jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  Further, this Court has jurisdiction because this case invokes both federal and state law claims.

6.     This Court has personal jurisdiction over Defendant Costco because Costco is registered to conduct business in Arizona and have sufficient minimum contacts in Arizona, or otherwise intentionally avails itself of the markets within Arizona through promotion, sale, marketing, and distribution of their products, to render the exercise of jurisdiction by this Court proper.

7.     This Court has personal jurisdiction over Defendant Boyd because Boyd conducts business in Arizona and has sufficient minimum contacts in Arizona, or otherwise intentionally avails itself of the markets within Arizona through promotion, sale, marketing, and distribution of its mattresses, to render the exercise of jurisdiction by this Court proper.

8.     Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Arizona.

///

**NATURE OF ACTION**

9. Plaintiffs purchased a mattress ("Mattress"), manufactured by Boyd and marketed and sold by Costco, that contained health-threatening and property-threatening fiberglass, a problematic non-natural component.

10. The Mattress contained a removable, inexpensive, and porous outer cover ("Outer Cover") equipped with a zipper and no warning labels.

11. The Mattress label specifically reads,

"Care Instruction

1. Removable Zippered Cover

2. Hand wash or machine wash cover on gentle cycle

3. Dry on gentle air cycle

4. Do not wash the foam

5. Do not dry clean

6. Do not use any bleach, bleach alternative, non-chlorine bleach or any bleach by products in the detergent".

12. Once the Outer Cover is unzipped and removed, a defective gauze-like unsealed sheath is over the mattress, which allows the glass fibers to then release into the surrounding environment causing injuries, property damage, or both.

13. Defendants falsely represented the Outer Cover was easy to clean and provided an outer, zippered cover, and no warning to not unzip the cover.

14. Plaintiffs were encouraged to clean the Outer Cover because it provided the cleaning instructions on the Mattress tag.

15. Defendants failed to warn that fiberglass could migrate through the inexpensive and porous Outer Cover to the surrounding environment.

16. The presence of the dangerous fiberglass was discoverable only after purchase and use of the mattress.

17.    Defendants failed to inform Plaintiffs of the presence of fiberglass in the mattress despite Defendants knowing the mattresses contained a hazardous material that readily be spread into consumer's eyes, lungs, and skin, and throughout homes on clothing, furniture, carpet, and air conditioning ducts, et al.

## GENERAL ALLEGATIONS

18.    By this reference, Plaintiffs restate, incorporate, and reallege all paragraphs set forth in this Complaint, including all paragraphs preceding and all paragraphs following this paragraph of the Complaint, and incorporates the same as if fully set forth in their entirety in this section.

19.    On or about April 20, 2020, Plaintiffs purchased the Mattress, a full size Sensalux 12" Medium Firm Hybrid Gel and Memory Foam mattress from Costco for their minor son, J.C. ("J.C.").

20.    The Outer Cover encased the Mattress, had a zipper, and the Mattress tags indicated that the cover could be removed for cleaning.

21.    The Mattress tags did not contain any warnings that if the Outer Cover was removed, fiberglass particles would be released into the air, onto humans, animals, property, and cause physical injuries and property damage, or both.

22.    The information provided to Plaintiffs, including the tag, failed to warn that fiberglass could migrate through the inexpensive and porous Outer Cover to the surrounding environment.

23.    In early March 2022, Plaintiffs moved to Arizona and into their newly purchased near new home.  When they moved in, the Mattress was placed in the Minor son's bedroom and was used by J.C. to sleep.

24.    In or around late April 2022, Plaintiffs removed the Outer Cover, by using the provided zipper, for cleaning.  This was the first and only time the Outer Cover was removed.

25. Plaintiffs followed the tag instructions to not use bleach when cleaning the cover. The cover was washed, dried in their dryer, placed back on the Mattress, and J.C. again began to sleep on the mattress.

26. In or around early May 2022, J.C., who had no prior history of bloody noses, began to experience frequent unexplained bloody noses and his asthma flare ups became inexplicably much more frequent.

27. In or around this time, Veronica Rivera also began having unexplained breathing problems and asthma flare ups, had unexplained skin irritations, and she was placed under a doctor's care.

28. Also, the Rivera's dog Bella, began having unexplained problems breathing and her eyes were very red, irritated, and inflamed.

29. After this time, the Riveras also noticed that J.C.'s clothing appeared to have lint, dust, or particles of some kind of material on J.C.'s clothes.

30. In late May 2022, Plaintiffs entered J.C.'s room to investigate the origin of this unusual material. When they entered J.C.'s bedroom and turned on the light, it appeared to Plaintiffs that they had walked into a disco ballroom with light reflective airborne flecks flying throughout the bedroom and laying on the surfaces of items in the bedroom.

31. Plaintiffs were shocked to see these unknown particles on the furniture, clothing, and bedding, and throughout the bedroom.

32. The Mattress was the only item in the room containing these particles, which was determined to be fiberglass.

33. The fiberglass particles had been released when the Outer Cover was removed for cleaning, had migrated through the inexpensive and porous Outer Cover, or both.

34.     The released fiberglass went through Plaintiffs ventilation and airconditioning system and spread into the rest of their home.

35.     After learning of the fiberglass, Plaintiffs immediately sealed off J.C.'s bedroom including the ventilation/air conditioning system to prevent further spread of the fiberglass throughout the house.

36.     The Riveras were very concerned about their own health, J.C.'s health, Bella's health, and the damage to their personal property resulting from their unknowing prolonged exposure to fiberglass.

37.     The fiberglass was detected throughout the entire home, including but not limited to the ventilation system, clothing, upholstery, carpets, tables, comforters, blankets, bags and purses.

38.     Shortly after learning of the fiberglass exposure, Plaintiffs promptly wrapped and sealed the Mattress and placed the Mattress in their garage to remove it from the living area and to maintain it for potential future inspection.

39.     The Riveras used the Mattress for its intended use and there were no adequate warnings about the fiberglass-containing fire-retardant layer on the Mattress tags or anywhere else.

40.     The tags encouraged removal of the Outer Cover by providing a zipper on the Outer Cover for easy removal, and by providing washing instructions for the Outer Cover.

41.     The information provided to Plaintiffs, including the tag, failed to warn against unzipping the Outer Cover or that fiberglass would be released if the Outer Cover were removed.

42.     The information provided to Plaintiffs, including the tag, failed to warn that fiberglass could migrate through the inexpensive and porous Outer Cover to the surrounding environment.

43.    Including a zipper in the Outer Cover invited Plaintiffs to unzip the Outer Cover.

44.    Having the zippered Outer Cover in combination with express suggestion to clean the Outer Cover exposed Plaintiffs to danger.  Yet there were no warnings of this danger from Costco, Boyd, or both.

45.    This suggestion to clean the Outer Cover was therefore misleading and fraudulent, because, as Defendants are aware, unzipping the zippered cover permits dangerous fiberglass to become distributed into the air, and is thereafter inhaled, enters into person's eyes and skin, can remain air borne, and lands on virtually every surface.

46.    Because of the nature of fiberglass particles, they are then easily collected into air conditioning and heating ducts, which, in combination with Plaintiffs traveling through the home and kicking up the fiberglass dust, spreads fiberglass throughout Plaintiff's home, and inundates them with fiberglass.

47.    Despite being aware of the dangerous nature of fiberglass in the Mattress, Defendants failed to place on its website any mention of fiberglass or danger to human health or belongings resulting from the Mattress.

48.    Despite being aware of the dangerous condition that the Mattress contained fiberglass that would be released into the atmosphere through ordinary use and routine cleaning, Costco and Boyd concealed that information from Plaintiffs.

49.    Plaintiffs relied on this lack of disclosure because if Costco, Boyd, or both informed Plaintiffs of this danger, Plaintiffs would not have purchased the Mattress.

50.    Costco should have, but failed to place warnings about the dangers of the fiberglass contained in the Mattress on its website so that consumers, like Plaintiffs could have made an informed decision about the dangers of the fiberglass within the Mattress.

51.    Boyd should have, but failed to place a mattress tag or in its warranty materials any warning about the dangers of the fiberglass contained in the Mattress.

52.     The withholding of information of which Costco and Boyd are aware is entirely by design.  Costco and Boyd offer a warranty on the Mattress, yet they failed to inform the Plaintiffs that there is any danger in removing the Outer Cover.

53.     There was no warning that removing the Outer Cover would expose a person to the danger of fiberglass exposure and contamination.  Nor were there warnings that fiberglass could make its way through the Outer Cover with normal use and cleaning.

54.     Defendants purposefully omitted from its website and other marketing materials for the Mattress any mention of potential hazards of fiberglass exposure and contamination.

55.     If Defendants had been truthful about the dangers of the Mattress because of the fiberglass release and exposure, Defendants knew consumers, including Plaintiffs, would be less likely to buy the Mattress.

56.     Plaintiffs relied on there being no warnings by Costco nor Boyd about the dangers posed by the fiberglass or the Mattress.

57.     The dangerous conditions in the Mattress existed at the time the Mattress left the hands of Defendants.

### Plaintiffs Provided Pre-Suit Notice to both Costco and Boyd.

58.     On or about May 26, 2022, Plaintiffs contacted and provided notice to both Costco and Boyd and informed them of the fiberglass contamination, exposure and resulting personal injury and property damage.

59.     The Riveras provided notice directly to a Boyd representative who informed the Riveras that it (the particles/flecks) was "fiberglass thread material that is used as a flame retardant in mattresses … and that we [Boyd] have since moved away from to avoid issues like yours."

Page 8 of 15

60.     At that time, Plaintiffs also provided notice directly to both Costco and Boyd that the tags on the Mattress did not provide any warning against removal of the Outer Cover nor that fiberglass would be released upon removal of the Outer Cover.

61.     While both Costco and Boyd offered to replace the Mattress only if Plaintiffs returned the Mattress, neither Costco nor Boyd offered any compensation whatsoever for Plaintiffs remediation of the fiberglass damage and cleanup in their home, nor for any of their personal injuries and property damage resulting from the fiberglass exposure from the Mattress.

62.     Costco and Boyd also informed Plaintiffs that Plaintiffs must return the Mattress to them in order to receive a replacement mattress.

63.     The Riveras informed Costco they would not do so because, in addition to the Mattress replacement, they also had valid claims for their personal injuries, for the damage to their personal property, and the Mattress was needed as evidence regarding causation to their personal injuries and property damages.

64.     Additionally, on February 26, 2024, the Riveras (through counsel) sent a pre-suit letter to both Costco and Boyd providing a detailed account and demand regarding the defective Mattress and the Riveras' resulting personal injuries and property damages.

### The Riveras Sustained Personal Injuries and Property Damages

65.     The Riveras sustained personal injuries and property damage as a result of their exposure to the Mattress' fiberglass particles.

66.     Due to the fiberglass exposure, both Mrs. Rivera's and J.C.'s asthma and allergies were severely exacerbated because they inhaled the fiberglass.

67.     Also, the glass fibers caused extreme physical pain and suffering by cutting the skin of each Rivera family member causing dermatitis and other skin irritations.

68. Bella, the Riveras' beloved family dog, also suffered from breathing problems, eye problems, and other skin irritations resulting from the fiberglass exposure.

69. The Riveras had to seek medical care for their own personal injuries and for injuries to Bella.

70. Along with physical symptoms caused by the fiberglass, the Plaintiffs experienced intense stress and mental suffering as they witnessed each other's breathing problems, and new skin conditions, and J.C.'s severe and frequent bloody noses, exacerbated breathing problems, and new skin conditions.

71. Plaintiffs also experienced intense stress and mental suffering caused by the fiberglass as they witnessed their beloved dog Bella suffer from eye and skin conditions; and they because their new home, including their air ducts and air-conditioning units, and personal property were now contaminated throughout with fiberglass particles from the Mattress.

72. The Riveras incurred significant expenses for the remediation of their home: they had to purchase many cleaning supplies, remove and replace most of their personal property including but not limited to bedding, clothing, handbags, carpet, and various furniture, and their house had to be professionally cleaned.

73. Remediation companies recommended Plaintiffs paint the interior walls of the house to seal in fiberglass particles that could not be cleaned, and to replace many appliances.

**COUNT I**
**BREACH OF IMPLIED WARRANTY**

74. By this reference, Plaintiffs restate, incorporate, and realleges all paragraphs set forth in this Complaint, including all paragraphs preceding and all paragraphs following this paragraph of the Complaint, and incorporates the same as if fully set forth in their entirety in this Count I.

75. The Mattress is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

76. The Riveras are the buyers of the Mattress, and are therefore "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

77. The Riveras purchased the Mattress, which caused the Riveras to suffer physical injuries, mental injuries, and property damage.

78. Defendants are engaged in the business of making consumer products directly or indirectly available to the public, including the Riveras, and are therefore obligated under an implied warranty to the public, including the Riveras.

79. Defendants owed the Riveras an implied warranty of merchantability in connection with the purchase of their Mattress.

80. As part of the implied warranty of merchantability, Defendants warranted that the Mattress is fit for its ordinary purpose as mattresses in safe condition and substantially free from defects.

81. Defendants impliedly warranted that the Mattress was safe for use. The presence of fiberglass that breaks and becomes released existed at the time the Mattress left Defendants' hands.

82. Each Defendant breached the implied warranties by providing the Mattress with a design defect which made the Mattress unreasonably dangerous by exposing the Riveras to dangerous glass fibers.

83. Defendants knew or should have known, and had actual or constructive knowledge that the Mattress was unreasonably dangerous and would cause injury if the Outer Cover was removed as a barrage of fiberglass would then be released and cause resulting in contamination of the surrounding environment, thereby causing personal and property injuries and damages.

84.     Each Defendant is liable to the Riveras under 15 U.S.C. § 2310(d)(1) because the Riveras suffered physical, mental, and property damages when the fiberglass became released and airborne.

85.     The Riveras have had sufficient direct and indirect dealings with each of the Defendants or their agents to establish privity of contract.

86.     The Riveras were intended third-party beneficiaries of contracts between Costco and Boyd.

87.     Although not required to give notice to Defendants, the Riveras did provide prompt notice in late May 2022 to Costco and to Boyd of the defect, and the Riveras gave each of them the opportunity to cure their breaches of the implied warranties, to no avail.

88.     The amount in controversy exceeds $75,000, and thereby complies with the controversy requirements under 15 U.S.C. § 2310(d)(3).

89.     The Riveras are entitled to reasonable attorneys' fees and court costs, including expert witness fees, under 15 U.S.C. § 2310(d)(2).

**COUNT II**
**STRICT LIABILITY**

90.     By this reference, Plaintiffs restate, incorporate, and realleges all paragraphs set forth in this Complaint, including all paragraphs preceding and all paragraphs following this paragraph of the Complaint, and incorporates the same as if fully set forth in their entirety in this Count II.

91.     Defendants designed, manufactured, distributed, supplied, and placed into the stream of commerce the Mattress in an unreasonably dangerous and defective condition.

92.     Defendants knew or should have known the Mattress could release the fiberglass resulting in contamination of the surrounding environment, thereby causing injuries and property damage.

Page 12 of 15

93.    Defendants knew or should have known the foreseeable risk that once released into an environment, the fiberglass is highly mobile and remains persistent on people and property, thereby causing damage to human health, pet health, and property.

94.    The dangerous or defective condition (the presence and release of fiberglass) existed at the time the Mattress left Defendants' hands.

95.    Upon information and belief, the Mattress was in substantially the same condition as when it left the possession and control of Defendants, and was defective and unreasonably dangerous by reason of its design, manufacture, and assembly.

96.    Defendants failed to warn of the danger of removing the Mattress Outer Cover, and instead encouraged the removal of the Outer Cover by providing a zipper for the Outer Cover removal, and by providing washing instructions for the Outer Cover.

97.    Defendants intentionally, recklessly, and without regard for human life and property, failed to provide proper and adequate notice or instruction regarding the dangers of the Mattress to human health, pet health, and property rendering the Mattress unreasonably dangerous for the purpose intended and promoted by Defendants.

98.    Defendants' duty to warn is and was a non-delegable duty.

99.    The Mattress was defective and unreasonably dangerous by reason of its design, manufacture, and assembly.

100.    Defendants' design defects are: (a) the inexpensive porous Outer Cover allows the fiberglass to migrate through the Outer Cover and the fiberglass is thereby released into the surrounding environment causing personal injuries, property damage, or both; and (b) the Outer Cover is equipped with a zipper inviting the user to remove it, which allows the fiberglass to release into the surrounding environment causing personal injuries, property damage, or both.

101.    Defendants, with the knowledge of the risks associated with fiberglass, failed to use a reasonable standard of care in their design of the Mattress.

102.    At all relevant times, reasonable safer design alternatives existed and were available to Defendants, and thus, the risks outweighed the benefits.

103.    The defects in the Mattress existed at the time it left Defendants' control and were known to Defendants.

104.    The Mattress was in substantially the same condition as when it left the possession and control of Defendants when it reached the Riveras.

105.    The damages and injuries to the Riveras and their property were caused by the acts and omissions of Defendants by and through their agents, servants, sub-agents and employees, acting in the course and scope of their employment.

106.    Defendants' failure to warn and deceptive conduct constitutes outrageous and reprehensible conduct, justifying an award of punitive damages to the Riveras.

107.    As a direct and proximate result of Defendants' acts and omissions, the Riveras have suffered and continue to suffer harm as stated hereinabove in this Complaint.

**COUNT III**
**NEGLIGENCE**

108.    By this reference, Plaintiffs restate, incorporate, and realleges all paragraphs set forth in this Complaint, including all paragraphs preceding and all paragraphs following this paragraph of the Complaint, and incorporates the same as if fully set forth in their entirety in this Count III.

109.    Defendants had a duty to exercise reasonable care in the manufacture, distribution, and use of its fiberglass containing Mattress to avoid harm who would be foreseeably injured by fiberglass contamination.

110.    Defendants knew or should have known of the serious risk that the Mattress could release fiberglass into the surrounding environment, thereby causing personal and property injuries.

111. Defendants breached their duty by failing to exercise reasonable care in the manufacture, distribution, and use of its fiberglass containing Mattress, and thereby breached their duty to avoid harm to Plaintiffs.

112. Defendants breached this duty by faulty manufacturing of the Mattress and by failing to warn of the danger associated with fiberglass exposure.

113. Defendants' breaches of duty directly and proximately caused Plaintiffs' personal injuries and property damages.

114. Defendants' failure to exercise reasonable care in the manufacture, distribution, and use of its fiberglass containing Mattress constitutes outrageous and reprehensible conduct, justifying an award of punitive damages to Plaintiffs.

## PRAYER FOR RELIEF

Plaintiffs requests a judgment in favor of Plaintiffs against Defendants as follows:

A.    For actual and statutory damages;

B.    Consequential damages;

C.    Punitive damages;

D.    Attorneys' fees and costs, including expert witness fees;

E.    Pre-judgment and post-judgment interest at the highest legal rate;

F.    For such other and further relief the Court deems just and proper.

SUBMITTED this 25th day of April 2024.

MOREY LAW, PLLC

/s/ Lorraine Morey
Lorraine Morey
*Attorney for Plaintiffs*